1
2
3
4
5
6
7
8        **IN THE UNITED STATES DISTRICT COURT**

9        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ANDRE LaSHAUN THOMPSON,                    No.  2:19-CV-2565-DAD-DMC-P

12              Plaintiff,

13        v.                                     <u>FINDINGS AND RECOMMENDATIONS</u>

14   R. OMARI, et al.,

15              Defendants.

16

17            Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to

18   42 U.S.C. § 1983.  Pending before the Court is Defendants' unopposed motion for summary

19   judgment, ECF No. 35.

20            The Federal Rules of Civil Procedure provide for summary judgment or summary

21   adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file,

22   together with affidavits, if any, show that there is no genuine issue as to any material fact and that

23   the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

24   standard for summary judgment and summary adjudication is the same.  <u>See</u> Fed. R. Civ. P.

25   56(a), 56(c); <u>see also</u> <u>Mora v. ChemTronics</u>, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of

26   the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  <u>See</u>

27   / / /

28   / / /

Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

2

1    court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.

2    Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

3    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

4    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

5    1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the

6    judge, not whether there is literally no evidence, but whether there is any upon which a jury could

7    properly proceed to find a verdict for the party producing it, upon whom the onus of proof is

8    imposed." Anderson, 477 U.S. at 251.

9

10                                   **I.  BACKGROUND**

11        A.        **Plaintiff's Allegations**

12              This action proceeds on Plaintiff's first amended complaint.  See ECF No. 11.

13   Plaintiff names the following as defendants: (1) Omari, a licensed vocational nurse at Mule Creek

14   State Prison (MCSP); and (2) Rudas, a physician at MCSP.  See id. at 2.

15              Plaintiff states that, on May 24, 2019, at MCSP he suffered a broken toe on his

16   right foot.  See id. at 3.  Plaintiff states that he complained about the injury to Defendant Omari,

17   but that Omari refused to "treat Plaintiff for his emergency medical care."  Id.  Plaintiff alleges

18   that, after many requests for treatment, he was finally seen by Defendant Omari "who acted with

19   deliberate indifference toward Plaintiff when he [Plaintiff] demonstrated his inability to walk."

20   Id.  Plaintiff contends that he was told by Omari: "I do not care about your medical needs; return

21   to your prison cell."  Id.  Plaintiff claims that he was denied treatment on May 28, 2019, May 30,

22   2019, and June 1, 2019.  See id.

23              Plaintiff next states that he was seen by Dr. Rudas on June 29, 2019.  See id.

24   According to Plaintiff, Dr. Rudas told him: "Your pain and suffering is of no concern to me, so

25   just deal with it."  Id.  Plaintiff states that Dr. Rudas "conceded" on July 5, 2019, that Plaintiff's

26   toe was indeed broken.  Id.

27   / / /

28   / / /

                                           3

1

**B.**     **Procedural History**

2         On August 4, 2021, the Court determined that Plaintiff's first amended complaint

3    was appropriate for service on Defendants Omari and Rudas.  See ECF No. 13.  On August 17,

4    2021, Defendants filed a notice of their intention to waive service of process.  See ECF No. 17.

5    Waivers of service were returned for both defendants on September 15, 2021.  See ECF No. 18.

6    Defendants filed their answer to the first amended complaint on October 18, 2021.  See ECF No.

7    19.  On December 1, 2021, after an unfruitful settlement conference, the Court issued a discovery

8    and scheduling order for the case.  See ECF No. 23.  On November 9, 2022, the Court issued an

9    order modifying the schedule and directed that dispositive motions be filed within 90 days of the

10   close of discovery on February 6, 2023.  See ECF No. 34.  Defendants timely filed the currently

11   pending Motion for Summary Judgment on May 8, 2023.  See ECF No. 35.  Plaintiff has not filed

12   an opposition.

13

14                      **II. DEFENDANTS' EVIDENCE**

15        Defendants' unopposed motion for summary judgment is supported by a Statement

16   of Undisputed Facts (DUF), ECF No. 35-1, as well as the declarations from defense counsel Lilit

17   Arabyan, ECF No. 35-2, R. Rudas, ECF No. 35-3, R. Omari, ECF No. 35-4, D. Santos, ECF No.

18   35-5, and M. Delina, ECF No. 35-6.

19        Based on the DUF and declarations provided therewith, Defendants offer the

20   following general statement of the case and background facts, which the Court accepts given that

21   Plaintiff has not filed an opposition to Defendants' motion:

22              Plaintiff Andre L. Thompson, an inmate proceeding *pro se*, asserts
             an Eighth Amendment medical deliberate indifference claim against
23              Defendants Dr. Rudas and Nurse Omari based on treatment that
             Thompson received for a toe injury in May 2019 at Mule Creek State
24              Prison (MCSP). (Defs.' Separate Statement of Undisputed Facts (DUF)
             No. 1.) Thompson alleges that, while housed at MCSP, he was involved in
25              an inmate fight on May 24, 2019, and suffered a broken toe. (*Id.* at No. 2.)
             Thompson alleges that he requested and was denied treatment for his
26              toe by Dr. Rudas and Nurse Omari. (*Id.* at No. 3.) Thompson alleges that
             Defendants' delay in providing him treatment caused his toe to deform
27              and affected his walk. (*Id.* at No. 4.)

28   / / /

4

Dr. Rudas was a Primary Care Physician at MCSP, where inmate Thompson was housed at the relevant times alleged in Thompson's operative complaint. (DUF No. 5.) In this role, his primary duties included triage and treatment of inmate patients referred to the MCSP Triage and Treatment Area (often referred to as the TTA). (*Id.* at No. 6.)

Nurse Omari worked as a Primary Care Registered Nurse at Mule Creek State Prison at the relevant times alleged in Thompson's operative complaint. (*Id.* at No. 7.) Nurse Omari's primary duties included processing formal requests for medical treatment—those submitted by inmates via a CDCR Form 7362 Health Care Service Request Form. (*Id.* at No. 8.) His duties did not include processing walk-in inmates-patients or informal requests to be treated. (*Id.* at No. 9.) As a Registered Nurse, he would not interact with a walk-in inmate requesting to be seen without a CDCR Form 7362 Health Care Service Request. (*Id.* at No. 10.) In the Mule Creek State Prison clinic, walk-in inmate-patients that appear at the clinic without having been scheduled in connection with a submitted CDCR Form 7362 Health Care Service Request Form are seen by Licensed Vocational Nurses (LVN) and redirected to appropriate disciplines for treatment and care. (DUF No. 11.) Walk-in patients with life-threatening medical emergencies, or those affecting life, limb, or eyesight, are elevated to the TTA and all other walk-ins are notified to submit a CDCR Form 7362 Health Care Service Request, which are then reviewed and processed by the appropriate medical staff. (*Id.* at No. 12.)

ECF No. 35, pg. 8.

Additional facts, which Plaintiff does not dispute, are outlined in the DUF. According to Defendants' evidence, Plaintiff was involved in a fight with multiple other inmates on May 24, 2019. See ECF No. 35-1, DUF No. 13. When hitting one of the inmates, Plaintiff went forward and kicked the curb with his right toe. See id. at DUF No. 16. Plaintiff was issued a rules violation report the same day for willfully participating in a riot. See id. at DUF No. 18. After correctional staff broke up the fight, additional staff responded and nurses were instructed to set up a medical triage area in the gym for involved inmates. See id. at DUF No. 22. Plaintiff was offered decontamination because pepper spray had been used, but Plaintiff refused. See id. at DUF No. 23. Plaintiff was then taken to the gym triage facility. See id. at DUF No. 24.

As part of the triage process which occurred in the gym after the fight, Licensed Vocational Nurse M. Pelayo completed a form CDCR 7219 "Medical Report of Injury or Unusual Occurrence" which included a section for Plaintiff's statement or reported injuries. See id. at DUF No. 27. Plaintiff stated: "no statement." See id. Plaintiff reported to the medical clinic the next day and was instructed by Nurse Omari to complete a form CDCR 7362 "Health Care Service Request Form." See id. at DUF No. 30. Plaintiff did not ask to be seen by any medical

1    professionals that day or the day after.  See id. at DUF No. 31.  Plaintiff did not submit a form

2    CDCR 7362 in the days following the inmate fight because he believed the toe injury was of an

3    emergent nature that did not warrant filling out the form.  See id. at DUF Nos. 32 and 33.

4           Plaintiff did not submit any form CDCR 7362 request for medical attention in May

5    2019.  See id. at DUF No. 34.  On June 1, 2019, Plaintiff submitted a form CDCR 7362

6    complaining of pain in his right toe and stating that he sustained the injury to his right toe in the

7    May 24, 2019, inmate fight.  See id. at DUF No. 35.  Plaintiff was seen at the medical clinic on

8    June 3, 2019, by Registered Nurse L. Markham regarding his right toe complaints.  See id. at

9    DUF No. 37.  The nurse's notes reflect that Plaintiff walked to the clinic that day.  See id. at 38.

10   Nurse Markham ordered x-rays to be taken on June 6, 2019, as a high priority.  See id. at 42.

11   Plaintiff was provided pain medication.  See id.  Plaintiff was scheduled for a follow-up clinic

12   visit on June 6, 2019, and returned to his housing unit.  See id. at DUF No. 43.

13          Plaintiff was seen at the medical clinic on June 6, 2019, by Dr. Rudas regarding

14   his right toe complaint.  See id. at DUF No. 44.  Plaintiff told Dr. Rudas that he was in mild pain.

15   See id. at DUF No. 45.  An x-ray of Plaintiff's foot was taken.  See id. at DUF No. 47.  Dr. Rudas

16   diagnosed Plaintiff with a displaced fracture of the right big toe and placed Plaintiff on restricted

17   return to work through September 6, 2019.  See id. at DUF Nos. 48 and 49.  The previously

18   provided pain medication was continued and Dr. Rudas ordered that Plaintiff be provided his

19   meals at his cell to prevent him from having to walk to get his meals.  See id. at DUF Nos. 50 and

20   51.  Dr. Rudas also provided Plaintiff with a Controlled Ankle Motion (CAM) boot to help

21   prevent his toe from being injured further, and an off-side specialist visit was scheduled to be

22   conducted within 14 days.  See id. at DUF Nos. 53-56.

23          Plaintiff's off-site specialist appointment occurred on June 18, 2019, as directed by

24   Dr. Rudas.  See id. at DUF No. 61.  Plaintiff was seen again off-site on June 26, 2019, and

25   surgery was recommended.  See id. at DUF No. 75.  On June 28, 2019, Dr. Rudas ordered high

26   priority surgery.  See id. at DUF No. 76.  Dr. Rudas ordered a pre-surgery EKG test the same day.

27   See id. at DUF No. 78.  The EKG test was performed on July 1, 2019, in preparation for surgery

28   which had been scheduled for July 5, 2019.  See id. at DUF No. 79.  Plaintiff was seen again by

1  Dr. Rudas on July 3, 2019, at which time Plaintiff was instructed not to eat anything on July 4,

2  2019, after midnight in preparation for surgery the next day.  See id. at DUF No. 82.

3        Surgery was performed as scheduled on July 5, 2019.  See id. at DUF No. 83.

4  Following the surgery, Plaintiff was returned to custody in stable condition and walked with the

5  aid of crutches provided by the hospital.  See id. at DUF No. 85.  At a post-surgery follow-up

6  with Dr. Rudas on July 8, 2019, Plaintiff complained of pain since surgery and Dr. Rudas

7  prescribed a stronger pain medication.  See id. at DUF Nos. 87 and 88.  Dr. Rudas continued to

8  provide post-surgery follow-up care in July 2019.  See id. at DUF Nos. 89-92.  By May 18, 2020,

9  Plaintiff reported to Registered Nurse E. Tejada that his foot was not hurting anymore.  See id. at

10  DUF No. 102.  On October 19, 2020, another x-ray was obtained, as ordered by Dr. Rudas, which

11  showed that Plaintiff's right big toe deformity had healed following surgery.  See id. at DUF Nos.

12  103 and 104.

13

14  **III.  DISCUSSION**

15        In their motion for summary judgment, which is unopposed, Defendants argue

16  Plaintiff cannot show that Rudas or Omari acted with a sufficiently culpable state of mind to

17  satisfy the deliberate indifference standard for an Eighth Amendment claim.  See ECF No. 35,

18  pgs. 17-22.  As to Dr. Rudas, Defendants contend the undisputed evidence shows that Dr. Rudas

19  provided Plaintiff with appropriate treatment.  See id. at 17-20.  As to Nurse Omari, Defendants

20  assert that Nurse Omari's actions did not amount to deliberate indifference.  See id. at 20-22.  For

21  the reasons discussed below, the Court agrees and finds that summary judgment in Defendants'

22  favor is appropriate.

23        The treatment a prisoner receives in prison and the conditions under which the

24  prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

25  and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan,

26  511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts

27  of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102

28  (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

1  Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

2  "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy,

3  801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when

4  two requirements are met: (1) objectively, the official's act or omission must be so serious such

5  that it results in the denial of the minimal civilized measure of life's necessities; and (2)

6  subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

7  inflicting harm. See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

8  official must have a "sufficiently culpable mind."  See id.

9          Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

10  injury or illness, gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105;

11  see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health

12  needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982), abrogated on other grounds by

13  Sandin v. Conner, 515 U.S. 472 (1995).  An injury or illness is sufficiently serious if the failure to

14  treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and

15  wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled

16  on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc); see

17  also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness

18  are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2)

19  whether the condition significantly impacts the prisoner's daily activities; and (3) whether the

20  condition is chronic and accompanied by substantial pain. See Lopez v. Smith, 203 F.3d 1122,

21  1131-32 (9th Cir. 2000) (en banc).

22          The requirement of deliberate indifference is less stringent in medical needs cases

23  than in other Eighth Amendment contexts because the responsibility to provide inmates with

24  medical care does not generally conflict with competing penological concerns. See McGuckin,

25  974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

26  decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

27  1989).  The complete denial of medical attention may constitute deliberate indifference. See

28  Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical

1   treatment, or interference with medical treatment, may also constitute deliberate indifference.  See

2   Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also demonstrate

3   that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

4          Negligence in diagnosing or treating a medical condition does not, however, give

5   rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a

6   difference of opinion between the prisoner and medical providers concerning the appropriate

7   course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh,

8   90 F.3d 330, 332 (9th Cir. 1996).

9        **A.**    **Dr. Rudas**

10          The Court agrees with Defendants that the evidence, which is necessarily

11   undisputed because Plaintiff has not opposed Defendants' motion for summary judgment, shows

12   that Dr. Rudas was not deliberately indifferent.  To the contrary, the evidence clearly shows that

13   Dr. Rudas treated Plaintiff's condition and was responsive to Plaintiff's medical needs.  Dr.

14   Rudas promptly saw Plaintiff on June 6, 2019, after Plaintiff submitted a form CDCF 7362

15   request for medical treatment on June 1, 2019.  Thereafter, Dr. Rudas performed necessary

16   evaluations, including obtaining an x-ray, and scheduling Plaintiff for surgery on an urgent basis.

17   The surgery occurred soon thereafter on July 5, 2019.  On these facts, the Court finds that Dr.

18   Rudas is entitled to judgment as a matter of law.  See Toguchi v. Chung, 391 F.3d 1051, 1057-61

19   (9th Cir. 2004) (affirming summary judgment to defendants where the evidence showed that the

20   defendants had treated the inmate's condition and were responsive to the inmate's medical

21   needs).

22        **B.**    **Nurse Omari**

23          The Court also finds that summary judgment in Nurse Omari's favor is appropriate

24   on the facts presented by Defendants, which are not in dispute.  Immediately following the May

25   24, 2019, inmate fight and injury to Plaintiff's toe, Plaintiff was taken to the gym for triage.  At

26   that time, he made no statement.  The next day Plaintiff reported to the medical clinic where

27   Nurse Omari instructed Plaintiff to submit a form CDCR 7362 if he wanted medical attention.

28   Plaintiff did not submit any such form until June 1, 2019.  Thereafter, as outlined above, Plaintiff

1   received continuous treatment from Dr. Rudas and other medical professionals, culminating in

2   successful surgery on July 5, 2019.  There is simply no evidence that Nurse Omari ever refused to

3   treat Plaintiff or provide him guidance as to how to obtain medical care if he sought it.  To the

4   contrary, the undisputed evidence shows that Nurse Omari gave Plaintiff appropriate instructions

5   as to how to obtain medical treatment from the clinic and any delay in receiving such treatment

6   was created by Plaintiff failing to file a form CDCR 7362 until July 1, 2019.  Nurse Omari is also

7   entitled to judgment as a matter of law.  See McCarter v. CDCR, 2011 WL 2982944 (C.D. Cal.

8   2011) (finding summary judgment in favor of prison nurse appropriate on similar facts).

9

10                                      **IV.  CONCLUSION**

11          Based on the foregoing, the undersigned recommends that Defendants' unopposed

12   motion for summary judgment, ECF No. 35, be GRANTED.

13          These findings and recommendations are submitted to the United States District

14   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

15   after being served with these findings and recommendations, any party may file written objections

16   with the Court.  Responses to objections shall be filed within 14 days after service of objections.

17   Failure to file objections within the specified time may waive the right to appeal.  See Martinez v.

18   Ylst, 951 F.2d 1153 (9th Cir. 1991).

19

20   Dated:  July 27, 2023

21                                                  _____

22                                                  DENNIS M. COTA
                                                    UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28